UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:14-CR-83 JD |
| ANTWON WILLIS | |

**OPINION AND ORDER**

A jury found Antwon Willis guilty of conspiring to distribute at least 100 grams of heroin. The Court then sentenced Mr. Willis to 235 months of imprisonment. After an unsuccessful appeal, Mr. Willis moved to vacate his conviction and sentence under § 2255, claiming ineffective assistance of counsel. Upon initial review, the Court limited his petition to one claim—that his trial attorney failed to raise a public authority defense— and allowed an evidentiary hearing on the issue. (DE 560.) After the hearing, the parties submitted supplemental briefs. Having reviewed the evidence and the arguments of counsel, the Court will dismiss Mr. Willis's remaining claim.

**A. Factual Background**

Mr. Willis first came to the Drug Enforcement Agency's ("DEA") attention on July 14, 2010, when he was arrested after selling heroin to a confidential informant ("CI"). Mr. Willis admitted to the DEA agents that he was dealing heroin and discussed the possibility of working as a CI.

The next day, July 15, Mr. Willis entered into a Confidential Source Agreement with the DEA. Special Agent Christopher Geer testified at the evidentiary hearing that he offered the agreement to Mr. Willis, read it along with him, and explained each provision of the agreement.

According to Agent Geer, Mr. Willis initialed each of the twenty-two agreement provisions, indicating his understanding of, and consent to, the agreement.[1] (DE 632, Hrg. Tr. at 100.) Agent Geer believed that Mr. Willis understood the terms of the agreement. (*Id*.)

Under the terms of the Agreement, Mr. Willis agreed "to provide assistance in the investigation of violations of the Controlled Substances Act." (Hrg. Ex. C, Confidential Source Agreement at 1; Hrg. Tr. at 101–02.) In particular, he would assist the DEA "under the direct supervision or control of DEA Controlling Investigators" (*id.*), and his actions would be limited to those enumerated in the Agreement (Hrg. Tr. at 105; Hrg. Ex. C ¶12 ("I understand that I am only authorized to participate or engage in the specific conduct set forth above, and that I may not participate or engage in any other illegal activity.")). In paragraph 5 of section II of the Agreement, Mr. Willis expressed his understanding and agreement that he had "no immunity or protection from investigation, arrest, or prosecution for anything that I say or do, except for activities specifically authorized by my Controlling Investigators pursuant to my cooperation with DEA." (Hrg. Ex. C, Acknowledgments, ¶ 5; Hrg. Tr. at 104.) He further agreed that he would "abide by the instructions of [his] Controlling Investigators and [would] not take any independent action on behalf of DEA or the United States Government." (*Id*.) Mr. Willis also agreed to immediately contact his Controlling Investigators if anyone asked him to "participate in any of the prohibited conduct listed in [paragraph 14]." (Hrg. Ex. C, Acknowledgments, ¶ 14; Hrg. Tr. at 106.) Finally, the Agreement stated that it was in effect from July 15, 2010, through July 15, 2011. (Hrg. Ex. C, Acknowledgments, ¶ 13; Hrg. Tr. at 106.)

---

[1] Mr. Willis also testified at the evidentiary hearing about the circumstances of his entering into the agreement and claimed that he did not read any part of the agreement and that Agent Geer did not explain to him any of the provisions. For the reasons explained in greater detail below, the Court finds Mr. Willis's testimony not credible.

Mr. Willis received no promises except those stated in the Agreement, and no one told him that he had immunity for any future investigations. (Hrg. Tr. at 109.) In fact, neither Agent Geer nor any Assistant United States Attorney had authority to enter into any immunity agreement with Mr. Willis. (Hrg. Tr. at 108.)

Mr. Willis's active cooperation lasted until November 2010. In August 2010, he entered an apartment that belonged to one of the targets of investigation after it was left unlocked for him. On September 14 and 16, 2010, he attempted a controlled purchase of 50 grams of heroin. The attempt was unsuccessful. Shortly before the attempt, he placed several phone calls to the target of the investigation. Next, on October 21, 2010, Mr. Willis completed a controlled purchase of 10 grams of heroin. (Hrg. Tr. at 12; 53–54.) The DEA agents met with him to brief him before the purchase, searched him and his car, provided him with money and recording equipment, told him where the purchase should take place, told him where to go afterward, followed him to the location of the drug deal, and then met him after the transaction for debriefing and to retrieve the drugs and the recording equipment. (Hrg. Tr. at 54–57.)

During that time period, Mr. Willis met with Agent Geer with some regularity. (Hrg. Tr. at 15.) He last met with Agent Geer on November 29, 2010. Special Agent Bushman and two Assistant United States Attorneys ("AUSAs"), Jennifer Levin and Johnson, were also there. Mr. Willis testified that he gave a proffer at the meeting, and that AUSA Levin urged him to do better: "she said that, you know, 'You need to do better, get back out there, get your eyes, ears to the street. And she looked at me and said, 'I know you can do this and get in contact with these agents.'" (Hrg. Tr. at 30.) Mr. Willis claims he understood this to mean that he was being put back on the streets to try harder: "So in my little world, I was—I thought I either was going to be prosecuted or locked up or relieved, you know, 'We no longer need you.' It was that—I was put

back out there." (*Id*.) Under cross-examination, Mr. Willis conceded that AUSA Levin did not tell him that he had a Tri-State immunity deal or that he had "immunity for future drug dealing." (Hrg. Tr. at 62–63.) According to Mr. Willis, after this meeting, he tried to ingratiate himself with Javarie "Black" Mhoon and his drug dealing network. He believed that the Government was going to contact him after his full year as a CI was up. (Hrg. Tr. at 65, 69.)

On December 21, 2010, upon learning that Mr. Willis continued selling narcotics, Agent Geer deactivated him as a CI. (Hrg. Tr. 189–90.) Although Agent Geer's notes showed that he informed Mr. Willis's counsel about the deactivation, Agent Geer himself had no recollection of that. In any case, there's no evidence that Mr. Willis's attorney communicated to Mr. Willis that he had been deactivated. As for Mr. Willis, he had not told anyone that he no longer wished to be a CI. After their last meeting in November, Agent Geer had no communication with Mr. Willis until Mr. Willis was arrested four years later in October 2014.

Evidence at Mr. Willis's trial showed that he enlisted his girlfriend, Ericka Simmons, to help him sell heroin. (DE 560 at 3.) The Superseding Indictment alleged that they conspired to distribute more than 100 grams of heroin "[f]rom an unknown date in 2009, up to and including October 2014." (DE 169, Superseding Indictment at 1.) However, most of the evidence at trial focused on the later years of the conspiracy. The evidence showed that beginning in the second half of 2011, Mr. Willis was selling heroin to various persons in Indiana, including Jordon Gutowski ($100–200 worth of heroin every other day for 2 years), Brandon Heuer ($50–100 a day beginning in 2014), Brittany Lemond ($400–500 three times a week), Matt Fletcher (few hundred dollars, 100 times per year), and Derrick Penwell ($500–1,000 per week). (Trial Tr. Vol. 2 at 121–22, 145, 205–205; Trial Tr. Vol. 3 at 10–13; 148–149.) Mr. Willis also shipped heroin to Ms. Lemond and Mr. Penwell in Iowa, Minnesota, and Michigan, where they would travel for

work. He would get paid via Moneygram with Ms. Simmons picking up the money. Once, Mr. Willis and Ms. Simmons drove to Iowa to deliver the drugs to Ms. Lemond while she was away for work. (Trial Tr. Vol 2 at 212, 230.)

The authorities arrested and interviewed Mr. Willis on October 14, 2014. (Trial Tr. Vol. 3 at 54.) Agent Geer was present during the arrest. At the time of the arrest, Mr. Willis did not indicate to anyone, including Agent Geer, that he was working as a CI, although he referenced in passing his past encounters with Agent Geer when interviewed. In fact, when one of the agents asked if Mr. Willis was worried when he had run-ins with Agent Geer in 2010, Mr. Willis did not segue into talking about him still being a CI. Also, contrary to thinking of himself as a CI, Mr. Willis shared with the agents his concern that certain of his customers may have been trying to compromise him with the DEA. What is more, he said he started seeing a black Taurus which he suspected to be the DEA and which gave him additional cause for concern. Also, at one point during the interview, he mentioned that, in the past, "we were trying to get [Black]," but then noted that he was now getting heroin from someone else. In the context of these references, there's no indication that Mr. Willis still considered himself as a CI at the time of, or before, his second arrest.

In April 2015, Attorney David Jones was appointed to represent Mr. Willis. At trial, Mr. Willis did not call any witnesses on his behalf:

> Instead, his attorney presented a more novel argument—one that made sense given the overwhelming evidence against him. Willis's attorney admitted that Willis was a drug dealer, but argued that the jury must acquit him because the government had not charged Willis with distribution. Instead, he was charged with conspiring to distribute heroin to "others," namely the Indiana addicts. Claiming the addicts were merely in a buy-sell relationship with Willis, his attorney argued that the government had failed to prove the conspiracy charged in the indictment.

5

*United States v. Willis*, 868 F.3d 549, 553 (7th Cir. 2017). The jury found both Mr. Willis and Ms. Simmons guilty of the conspiracy charge.

While Mr. Willis claims that he told Mr. Jones at their very first meeting that he was arrested by the DEA in 2010 and agreed to act as a CI and was given a CI number, Mr. Jones didn't recall any detailed conversations with Mr. Willis about his past CI work. The evidence does show that Mr. Jones received from the Government in discovery a DEA-6 report documenting Mr. Willis's proffer on November 29, 2010. However, Mr. Jones testified that he saw nothing in that document suggesting that Mr. Willis was a CI or that Agents Geer and Bushman were his handlers. On the other hand, it is undisputed that, at the time of Mr. Willis's sentencing, Mr. Jones knew that Mr. Willis "was given a CI number, he did cooperate, and he was put back out on the street." (DE 398, Sent. Tr. at 39.) At Mr. Jones's deposition, to the question of what investigation, if any, he did in relation to the public authority defense, he answered, "I did nothing." (Jones Dep. at 28.) During the same deposition, Mr. Jones said, "If Mr. Willis would have said he was actively working for the DEA, I would have made telephone calls. I mean, I would have—that would have been—that would have been a great defense." (*Id*. at 15.)

At sentencing, this Court found Mr. Willis to be responsible for more than 10 kilograms of heroin. During his allocution, Mr. Willis told the Court that, after being arrested in 2010 for possession of 50 grams of heroin, he became a CI. He suggested that the DEA put him back on the streets which made him resume selling drugs. (Sent. Tr. at 35–36.) After the allocution, the Court asked Mr. Jones if Mr. Willis was suggesting that any of the heroin that was attributed to him was the result of him working for the DEA. (*Id*. at 38.) Mr. Jones explained that Mr. Willis did have a CI number and that "[t]hey were after another individual that they could not get." (*Id*.

6

at 39.) He then told Mr. Willis to "speak up . . . if I say anything wrong," and proceeded to say that "he was given the opportunity to make some more money for himself." (*Id.*) Later he distinguished Mr. Willis's work as a CI from the instant case by acknowledging "that paragraph 59 in the presentence Investigation Report lists—although we don't necessarily agree with it, . . . all amounts that are involved in this case and this case only." (*Id.*) Upon hearing this, Mr. Willis said nothing.

The Court of Appeals for the Seventh Circuit affirmed Mr. Willis's and Ms. Simmons's convictions. Mr. Willis then filed a timely motion to vacate under § 2255. The only remaining challenge is his claim for ineffective assistance of counsel in relation to Mr. Jones not raising the public authority defense at trial.

**B. Discussion**

The Sixth Amendment provides a criminal defendant with the right to counsel, U.S. Const. amend. VI, and "inherent in this right is that the defendant is entitled to the effective assistance of counsel." *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (citation omitted). In order to prevail on his claim for ineffective assistance of counsel, Mr. Willis must establish (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The first prong of the *Strickland* analysis requires that the Court determine if counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common

custom." *Koons*, 639 F.3d at 351 (citing *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011)). Furthermore, the Court "maintain[s] a strong presumption that the defendant received effective assistance," *Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted).

The second prong of the *Strickland* analysis requires that there be a "reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different." *Recendiz*, 557 F.3d at 531. A "reasonable probability" that the result would have been different is a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In his motion pursuant to § 2255, Mr. Willis submits that his trial attorney, Mr. Jones, provided ineffective assistance of counsel by failing to present a public authority defense. In order to prevail on a public authority defense at trial, Mr. Willis would have had to show, by a preponderance of the evidence, that—

>   (1) A government agent requested, directed, or authorized the defendant to engage in the conduct charged;
>
>   (2) This agent had the actual authority to grant authorization for the defendant to engage in this conduct; and
>
>   (3) In engaging in this conduct, the defendant reasonably relied on the agent's authorization.

Pattern Criminal Jury Instruction 6.06 for the Court of Appeals for the Seventh Circuit. Whether a defendant reasonably relied on the agent's authority is an objective inquiry. *United States v. Neville*, 82 F.3d 750, 762 (7th Cir. 1996).

In his post-hearing brief, Mr. Willis spends little time considering what his burden would have been at trial and how he would have met it. Instead, he equates Mr. Jones's decision to not present a public authority defense as a mandate for granting his motion under § 2255. In fact, he

8

suggests that, under the circumstances, prejudice against Mr. Willis can be presumed. (DE 634, Def.'s Br. at 2.)

In structuring his argument, Mr. Willis largely relies upon his own testimony of what he told Mr. Jones before trial, a testimony that is contradicted by Mr. Jones's pre-hearing deposition. According to Mr. Willis, he told Mr. Jones in great detail about being a CI for Agent Geer, being assigned a CI number, and the kind of work he did. However, even his own testimony shows that this information had no relevance at trial as it concerned one or two attempted drug buys and one completed drug buy, all under the close scrutiny of the DEA. Furthermore, none of his cooperation was related to the charges in the Superseding Indictment. In addition, Mr. Willis's testimony is largely not credible. Mr. Willis refused to admit that he was guilty of the conspiracy of which he was convicted, he testified that he did not sell heroin in Indiana or in other states despite ample trial evidence to the contrary. He claimed that he did not sell drugs out of the Hammond apartment but was there only to conduct surveillance. In fact, despite the fact that, at sentencing, the Court found him responsible for selling more than 10 kilograms of heroin, he insisted on being "part of the good guys." (Hrg. Tr. at 46, 62.) Finally, Mr. Willis denied, contrary to Agent Geer's testimony and contrary to his attestation on the Confidential Source Agreement, that he read the Agreement along with Agent Geer and fully understood it. All of this taints Mr. Willis's testimony as to what and how much he told Mr. Jones about being a CI. It also undermines his testimony about believing that he continued acting as a CI from the time of his last meeting with the DEA agents and the AUSAs in November 2010 until his second arrest in October 2014, a proposition that is unreasonable on its face.

But regardless of what Mr. Willis told Mr. Jones—and even if Mr. Jones should have looked further on his own to find out what kind of work Mr. Willis did for the DEA—a public

authority defense is inapplicable under the facts of this case. Mr. Willis has not pointed to any evidence that someone with actual authority approved his criminal conduct. On its face, the Agreement does not authorize Mr. Willis to engage in heroin sales without the DEA's supervision. In fact, by accepting the Agreement, Mr. Willis specifically agreed not to engage in any unauthorized illegal activity. (Hrg. Ex. C ¶ 14 ("I understand that I may not, under any circumstances . . . initiate or instigate a plan or strategy to commit a federal, state, or local offense.") Furthermore, when Mr. Willis worked for Agent Geer, he was under close supervision at every step. Finally, as Agent Geer testified, he had no authority to permit the sale of real heroin, to enter into a tri-state immunity, or to offer perpetual immunity. Agent Geer further testified that to get authorization for Mr. Willis to sell heroin he would have had to get supervisor approval from the very top because the DEA has a policy against introducing heroin into the communities. Besides, in all of his years of working for the DEA, Agent Geer has never overseen a sale of real heroin. In other words, even if Mr. Jones had looked into Mr. Willis's work as a CI, he would not have uncovered any facts to support a public authority defense because there is no evidence that "a government agent requested, directed, or authorized the defendant to engage in the conduct charged." Pattern Criminal Jury Instruction 6.06 for the Court of Appeals for the Seventh Circuit. Furthermore, there is no evidence that any of the Government agents he worked with "had the actual authority to grant authorization for [him] to engage in this conduct." *Id*.

Finally, Mr. Willis could not have shown that "[i]n engaging in this conduct, [he] reasonably relied on the agent's authorization." *Id*. Insofar as Mr. Willis claims that he understood AUSA Levin's admonition to "do better" as an *imprimatur* for dealing heroin so as to infiltrate "Black's" network, such understanding is objectively unreasonable. AUSA Levin did

10

not speak in code, telling Mr. Willis to sell drugs; rather, she told him to be on the lookout for what was happening around him, and no reasonable person could construe her encouragement otherwise. *See United States v. Berg*, 643 F. Supp. 1472, 1480 (E.D.N.Y. 1986) ("The proposition that a defendant may commit a criminal act without prior notice to any Government official on the basis of a supposed carte blanche authorization or a license to do everything but kill is without precedent and stretches any concept of good faith reliance beyond recognition."); *cf. United States v. Neville*, 82 F.3d 750, 762 (7th Cir. 1996) (DEA agents' encouragement to "produce witnesses" was not "an authorization to commit the many other crimes"); *United States v. Cao*, 471 F.3d 1, 5 (1st Cir. 2006) ("[The Agent] testified, however, that he never authorized [the defendant] to engage in drug transactions and [the defendant] conceded that the agents did no more than ask to be called if [the defendant] learned of something big. This effectively dooms [the defendant's] request for a public authority instruction.").

Moreover, Mr. Willis's conduct during his arrest and the post-arrest interrogation in 2014 belies the fact that he knew that he wasn't selling drugs in a CI's capacity. When the agents approached him, he did not act as if he was a CI and, after his arrest, he expressed no surprise at being arrested nor was he claiming that there must have been some mix-up because he was working for the DEA. Additionally, during his interview, he himself distinguished what he was doing then from his past attempts to help the DEA to get "Black." Similarly, at the sentencing hearing, when Mr. Jones distinguished Mr. Willis's work as a CI from his criminal conduct in this case—urging him to "speak up . . . if I say anything wrong"—Mr. Willis did not correct him, tacitly acknowledging that what Mr. Jones was saying was true. Finally, at the evidentiary hearing, Mr. Willis admitted knowing that his CI agreement was for a one-year term. However, he claimed that he knew that one of his cousins was a CI for three years, so he thought that his

11

agreement could also be extended beyond the expiration date. Yet, given that the agreement had a firm end-date, Mr. Willis's assumption, without more, that he remained a CI after July 15, 2011, is unreasonable. Besides, it's likely that this purported assumption is instead an after-the-fact rationalization seeking to justify his criminal conduct.

To summarize, the Court finds that, even if Mr. Jones had investigated the facts concerning Mr. Willis's claim of a public authority defense, his investigation would have come up with no evidence to justify such a defense. Mr. Willis singles out Mr. Jones's observation during his deposition that a public authority defense "would have been a great defense" (DE 634 at 1), but that observation rests on the fact that it would have been a great defense had there been evidence to support it. Mr. Jones is not suggesting that there was such a defense that he failed to raise. On the contrary, there are no facts supporting Mr. Willis's notion that Mr. Jones's performance was deficient when he failed to investigate and raise a public authority defense at trial.

For the same reasons. Mr. Willis cannot show that, even if Mr. Jones's performance was deficient, there was a reasonable probability that the jury would have acquitted him had he presented a public authority defense. There simply isn't any evidence suggesting that "(1) a government agent requested, directed, or authorized [Mr. Willis] to engage in the conduct charged; (2) This agent had the actual authority to grant authorization for [him] to engage in this conduct; and (3) In engaging in this conduct, [Mr. Willis] reasonably relied on the agent's authorization." Pattern Criminal Jury Instruction 6.06 for the Court of Appeals for the Seventh Circuit. Instead, the evidence that Mr. Willis and Ms. Simmons conspired together to distribute heroin was overwhelming. *United States v. Willis*, 868 F.3d 549, 553 (7th Cir. 2017) ("[Mr. Willis's] attorney presented a more novel argument—one that made sense given the

12

overwhelming evidence against him."). Accordingly, although Mr. Willis was a CI at one point, and even though the Superseding Indictment covers that period of time, there is no reasonable probability that the jury would have considered his criminal conduct as authorized by the DEA. As explained above, the DEA agents granted him no such authority, nor did AUSA Levin, let alone the Confidential Source Agreement. In fact, none of them had authority to permit Mr. Willis to sell heroin. Accordingly, any argument at trial that Mr. Willis was selling drugs with the intention to infiltrate "Black's" organization would have been to no avail.

Mr. Willis argues that, in finding him guilty, the jury may have focused on the January 2011 sales, shortly after AUSA Levin encouraged him to try harder. He argues that, had the jury known that he was a CI, they may have found him not guilty. But this argument has no merit. The Superseding Indictment states that "[i]n late 2010 and early 2011, ANTWON WILLIS was involved with controlled buys of heroin with confidential informants and undercover police officers in Illinois and Northern Indiana." (DE 169 at 2.) In other words, in early 2011, the DEA used CIs and undercover agents to buy heroin from Mr. Willis, undermining any argument that the same DEA had simultaneously authorized him to sell heroin to its CIs and undercover agents. In simpler terms, if the DEA authorized Mr. Willis to sell heroin, what was the point for the DEA to buy heroin from him? The fact remains that Mr. Willis had no authorization to sell heroin on his own, whatever his intention may have been.[2] Because Mr. Willis has failed to show that Mr. Jones's performance was deficient and that the deficient performance prejudiced him, the Court will deny Mr. Willis's motion under § 2255.[3]

---

[2] Of course, as the Court noted above, it does not credit Mr. Willis's testimony that he was selling heroin with the hopes of infiltrating "Black's" organization in order to help the DEA to bring a case against him.

[3] In his post-hearing brief, Mr. Willis claims, for the first time, that the Government failed its discovery and *Brady* obligations by not providing to the defense the Confidential Source Agreement. As noted above, there remains only one claim under Mr. Willis's § 2255 motion: ineffective assistance of counsel. Mr. Willis has not

### C. Certificate of Appealability

The Court also declines to issue a certificate of appealability. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir. 2008). For the reasons the Court already discussed in denying the motion, the Court does not believe that the resolution of this motion is debatable or that the issues deserve encouragement to proceed further.

The Court advises Mr. Willis, though, that pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. If Mr. Willis wishes to appeal this judgment, a notice of appeal must be filed within 60 days after the judgment is entered. Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts; Fed. R. App. P. 4(a); *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006).

### D. Conclusion

---

asked for leave to advance new claims nor has he otherwise shown why this claim should now be considered. Accordingly, it does not merit discussion. And in any case, Mr. Willis has not shown that the Government was aware of the existence of the Agreement or that it believed that it was related to Mr. Willis's case. Finally, given the Court's findings the document is neither exculpatory nor could it lead to admissible relevant evidence.

15

For these reasons, the Court DENIES Mr. Willis's motion under § 2255 (DE 465).

SO ORDERED.

ENTERED: June 6, 2022

                                                    /s/ JON E. DEGUILIO
                                          Chief Judge
                                          United States District Court